Good morning, Your Honors. I am Frank Morel. I represent Mr. Jose Luis Rodriguez in this matter. I also represent Mr. Rodriguez in the trial court, in district court. Your Honors, we have three issues in this case. The first one is, did the court commit reversible error in denying defendant the motion to continue for the SPD trial act? The second issue relates to the sentencing, and that is, should the court have granted acceptance of responsibility under Section 3E1.1a? The third issue, also a sentencing issue, did the court err in placing defendant in supervised release? As to the first issue, Your Honors, this was a very difficult case. It was a prosecution for 1326, the legal entry after deportation. The defendant had been diagnosed previously with schizophrenia. We had issues... Diagnosed with what? Schizophrenia. Oh, okay. Forgive my accent. I don't want someone to get in there. Also, we had difficulties in, there was an issue of citizenship. We believe that his father had become a citizen, and we believe that there was an issue of citizenship in this case. And thirdly, there was a problem with client relationship. The government indicted this case on a theory of entry, on a 1326. Later on, they superseded the indictment by filing attempted error, which is specific intent crime. We asked for a continuance. The judge denied it. We asked for a continuance before, by the way, the superseding indictment because of these issues that were presented themselves. And then we renewed our motion on the 3161, at least 30 days after the superseding indictment was arraigned, and my client was arraigned. In what way, if any, did the change in the charge from the first indictment to the second change the case that you would have to present? And the reason I'm asking this, of course, is I'm trying to figure out if there's any prejudice. Even if there was some change, the trial goes forward, you know, a day early. So tell me what hardship that imposed on you for the change of theory. Of course, according to Rocha's Contreras, which basically says the same charges, if the same charges are indictment, then you're stuck. However, in this case, we have the issue of competency that we were exploring. We had the issue of citizenship. And essentially, when we came to court, the whole scope of our defense changed. We went from a general intent crime to a specific intent crime. Now, two that perhaps puts a greater burden on the government, but we had already prepared our defense. We had to change a few things. Specific intent crime also bears heavily on the mental capacity, mental status of the defendant. We were not afforded an opportunity to even go further into that and search that particular issue. And that's how we were prejudiced. And, again, we asked for a continuance before the superseding indictment, and we were denied. And then, again, after the superseding indictment, we were denied again for the same reasons. But the change in strategy that occurred because of the new charge, specific intent charge, really took away our defense. Because essentially, one of the defenses we had initially was that this entry was done under scrutiny. That is, that the government had seen him come in and had followed him in his entry in the United States. And he was basically under the government, how would you call it, preview. And it changed our defense completely. And we were not afforded an opportunity to actually go in and search. Because the first charge was having been found in the United States after having been deported. And that was the initial indictment. Entry, yeah. He entered the United States. And then the second charge was attempted entry. And that took away, essentially, our defense. Because he had been under governmental scrutiny. That is, he had been, the government had seen him come into the United States. And I forgot the term right now, your honors, but essentially the government had followed his entry in the United States. And he was under restraints, constraints by the government. And that is the reason why we wanted a continuance. Second, the second issue in this case is the acceptance of responsibility under 3.1A. Again, the judge made it clear that he did not wish to grant the acceptance of responsibility. Because in the judge's words, and I will quote from the record, I am not inclined to do that.  I don't think it applies here. You don't get punished for going to trial here. But that acceptance of responsibility is a reward that people earn for early acknowledgement of guilt. And as you heard me say to Mr. Morell, kind of saying, saving the time and expense of a trial. That didn't happen here in this case. So you haven't earned that. What did he ever do to warrant the exceptional circumstance for granting acceptance of responsibility for somebody that goes to trial? I mean, it happens. Correct. But what did he do to warrant that? Well, to begin with, there was a little mix-up at the time of the interview with the probation officer. At the time of the interview with the probation officer, Mr. Rodriguez essentially said, when I saw the officer and when he saw me coming in, I tried to go back to Mexico. And the probation officer used that to say, well, I'm not too sure he has accepted responsibility. But when he was in front of the judge, he actually acknowledged his guilt. And he said, look, I made a terrible mistake. And that's in the record. That's in the brief. I made a terrible mistake in coming to the United States. And I promise you that I'm going to go back after I finish whatever custody you give me and I'm going to stay in Mexico. His purpose for coming to the United States, as usually with 1326s, are he wanted to be back with his family. He had lived in this country for 40 years prior to that. He came to this country at the age of four. And this was his first deportation and his first entry into the United States. He was not aware of the laws. That's no excuse, of course. But he did show that he was sorry for what he had done. And he accepted responsibility for his actions in coming to the United States. Well, after he was convicted. Well, yes. But, Your Honor, we had defenses in this case. We wanted to go to trial not because he did not do the act of entry or attempt to enter the United States. Because we had defenses. One of them was that we believed that he had a derivative citizenship through his father who had naturalized. We could not find his father. We were in the process of finding his father. We never did, by the way. But at the sentencing, which is what matters, at the sentencing, he said, Look, I'm sorry, I made a mistake. And I'm going to go back to where I came from and I'm going to stay there. He didn't waive his right to appeal, right? Well, that was part of the government. The government says, and the judge essentially suggested, If you waive your right to appeal, which is what they're giving you a chance to, you know, I'll take that into consideration. But he had an issue. And the issue is that we're here before this Court. Why should he give up his rights to an appeal when he has a right to get acceptance of responsibility? I'm not saying you should. I'm not saying you should, but I'm trying to find out. Because it's very exceptional when you grant an acceptance of responsibility after trial. But it's done and it happens. But I still haven't heard anything that warrants in this case. Again, I think acceptance of responsibility is not necessarily a reward for not going to trial. Acceptance of responsibility is provided in the code for a client, for a defendant, to show remorse and to show that he is just repentant for what he has done and that he accepts his guilt and accepts essentially that he has offended society about his actions. He goes to trial on technical issues dictated by the strategy of the attorney. What was the technical issue here? Well, was the entry, attempted entry, and his mental conditions. And, again, the citizenship issue were there. We were still trying to get that information whenever we did. But those are the issues that were pertinent to that case. So why should he be punished for a decision that essentially turned him in? Do you think that he was the recipient of his father's naturalization? Yes. Yes, Your Honor. Why is it hard to call the citizenship and naturalization people online? Your Honor, unfortunately, that information is private. And unless you have an express G-39, well, it's a special form for immigration, signed by the recipient, signed by the person who is the owner of that information, the father in this case, immigration will not permit the files of recipients of naturalization or A-files reviewed by other individuals unless you have a signed waiver by that individual. We could never locate the father in this case. But we believe that he had become a citizen while my client was under the age of 18. And, of course, he would derive citizenship from his father and mother because we knew the mother was a citizen also. But we couldn't locate the father. So if we could do that, he would be, in fact, a U.S. citizen. Well, you're saying that if someone is naturalized, there's no way that you can find out the date the person was naturalized. And if you had that, you'd know, of course, you'd know the age of the son. The son was eligible to, whatever it's called, derivative citizenship. Correct, Your Honor. It's all secret. You can't get it unless you get, how about the mother? Correct. Well, the mother could not give us any information as to whereabouts of the father, Your Honor. But in order to get information... Well, was she naturalized? Yes. We were informed that the mother had been naturalized. Unfortunately, under the code, he has... Was she naturalized at the time her husband was naturalized? No. They were naturalized at different times, Your Honor. And we were not certain as to the time that he was naturalized. But to answer the Court's question, in order to review documents pertaining to someone else, you have to submit what is known as a G-28 to immigration to begin with, signed by the person who gives you authority on the Freedom of Information Act to review those documents. And then there's a special form to get the file, a G-139, to be honest, to be more correct. But if you don't have those documents, if you don't have at least a G-28 signed by your client... That's what you said. Immigration will not permit you. All right. And then the last issue, of course, is did the Court commit a reversible error in continuing... Forgive me. In placing the defendant on supervised release. In November of 2011, the new guidelines came into being. And under those guidelines, on a person that is going to be deported on a 1326, it is advisable. It advises the Court not to give supervised release or the conditions to supervised release to such a defendant after sentencing. And the judge did in this case. He placed my client on supervised release for three years. Yes, but that wasn't. The PSR wasn't wrong, though, because the guideline is still, as was stated in the PSR, it would have been better practice for the PSR to also then say, make reference to the guideline. But nonetheless, the statement as to the supervised release time was correct. That is correct. As a matter of fact, the PSR, Your Honor, was issued prior to the November 1st enactment, but the promulgation. So the provision also was correct in his recommendation to the Court of three years. But the thing is, at the sentencing, there was no mention. And I have to admit, because of the time, I did not even realize that this was the law that had changed under the sentencing guidelines. But there was no mention of that at all at sentencing, either from the probation officer, because the sentencing occurred on the 29th of November. Nobody mentioned it. And the judge didn't either. And in this case, we feel that the judge should have granted at least, should have sentenced him without having supervised release. Well, you can see why. I mean, looking at the record, you can see why the judge might give this fellow supervised release, though. Because it's highly likely he's going to come back. And if you've got a supervised release, you can revoke him easily then. That's true. But also, he faces a new charge, and everything increases. If he gets picked up, he faces another 1326. And the supervised release violation would not come into being unless it's picked up again. So you have another charge that you can do on top of the supervised release violation, which is totally unnecessary, because he's going to get punished twice as much. Yeah, but it's real easy, though. All you have to do is revoke the supervised release. You don't have to indict him or anything else. That is, I agree, but that is normally not the practice. In my experience in the Southern District of California, if you come in, especially after having been deported and 1326 once before, they're much, much harsher, and you will be facing another 1326. And if you're lucky, the judge on the prior 1326 will make a concurrent, if you're lucky. But normally you're not, and it's made consecutive. And that's the thing. And some of the sentences, like in this case, a 60-month sentence for an illegal entry, when the issue was a 422 under California law, terrorist threats, which is used all the time whenever you have a fight with your wife or with your husband. And it's simply unreasonable, 60 months, in my opinion, of course, as defense counsel. But that is the legalization. Of course, the judge did depart downward with regard to the sentence. Well, the judge went down 10 months from a 70. He went down 10 months under 3553 factors that the judge calculated. But nevertheless, 60 months on the first deportation after being in the country for 40 years as an LPR, and both your parents are U.S. citizens, question mark. Yeah, but the guidelines are really tough on that. That's the problem. I concur. I concur. All right. Thank you. Thank you, Raj. Thank you. Good morning. Tim Perry for the United States. I probably should start by speaking about the Speedy Trial Act. But before I do, I want to mention a couple of matters that pertain to the record. The first is that my recollection is that Mr. Morell did concede to the district court that the elements did not exist for a derivative citizenship defense, and that could be found in the excerpts of record at pages 17 to 18. And second, a colloquy between Judge Burns and Mr. Morell. And second, Judge Burns would probably want me to mention that he did not encourage the defendant to waive appeal in any way. In fact, he was very clear on the record that he wasn't getting into plea negotiations post-trial at all. On the speedy trial matters, we believe that Rojas Contreras settles the matter. Rojas Contreras sets forth a rule that the 30-day clock does not start to run again after a superseding indictment. And there is a case in the Ninth Circuit that's very similar to this one, unfortunately not cited in either of the briefs, a case called Flores. I can provide the citation or copies of the decision. It's a case of the- 477, 5th, 3rd, 1089. That sounds about right, Your Honor. Yes. It is. And so as Your Honor well knows, that's a case where a defendant was charged with being found in the United States. Illegally, the government superseded with an attempted charge just the same as in the case at Barr here. The defendant was arraigned on the superseding a day before trial, and this court decided that that was not something that ran afoul the speedy trial act. Judges Goodwin, Tashima, and Fletcher were on that decision. The review was for plain error in that case. However, the court was clear that there was no error, plain or otherwise, in not continuing the case in the judge's interpretation of the speedy trial act. There also was not an abuse of discretion by the district court in this case for not continuing the case on the day of trial, as Mr. Morell had asked. And the reason is that the district court found that the defendant in this case was malingering, that the defendant was faking it. There are a number of places in the record where the district court sets this forth. The district court even has a couple of what I would call meta moments where he says that he doesn't want the cold record to be misunderstood, that he's had a lot of experience with this defendant, speaking to this defendant, seeing this defendant live in court. One of the best quotes, perhaps one of the most summarizing quotes that I could cite in the record, is at 43 where the judge says, so again, I underscore this. I have a very firm conviction that these three things have been raised, discontent with his counsel, alleged bias on the part of the court, a so-called mental disorder that prevents him from assisting. All of these things, I find, are pretextual. They're made to force the court to give him a continuance now. Elsewhere, the district court refers to this as subterfuge and suggests that Mr. Rodriguez is trying to accomplish indirectly what the district court had already denied him directly. One of the reasons that we allow district courts such broad discretion is that they do get to see the defendant. They do get to interact with the defendant. They are not operating just off of a transcript, and I would suggest that in a case like this, where there is subterfuge on the part of the defendant, the district court didn't abuse its discretion in denying the motion. Well, the district court's just speculating. I mean, it takes a psychiatrist or a psychologist or whatever. He said he claimed he was schizophrenic. He, the record is not entirely clear on that. The defendant actually says that he believes that he was diagnosed with schizophrenia in the past. Mr. Morell says that this is not an issue of competency. The district court finds that there is no issue of competency. The defendant at 57 in the excerpt from the record says he doesn't want to see a doctor. He, in the PSR, says he was diagnosed with schizophrenia. He does not provide any corroboration of that fact. He can't name his doctor or his medication. He affirms that he was on medication for trial, but then he concludes that, quote, he does not believe he suffers from mental illness. That's a quote not of the defendant, but a quote of the probation officer, which was in the PSR at page 10. So I don't think that the district court was speculating. He had a record not only at sentencing later where the defendant disavows a mental disorder, but he also obviously met with the defendant, saw the defendant, interacted with the defendant on a number of different hearings leading up to trial. Well, it doesn't take a great deal of delay. You can get him to a doctor and get a report the next day. That is true, and the district court asked the defendant whether he wanted to see a doctor. The defendant said that he did not want to see a doctor. And Mr. Morell himself said that he did not see any, I don't want to misquote him, but Mr. Morell did not ask for a competency hearing, did not believe that the defendant's mental condition raised to the level of a situation where he would want there to be a competency hearing. With that, unless the court has further questions, I am inclined to submit. Thank you. I'll give you a minute. Thank you, Your Honor. You're way over your time. Very quick, Your Honor. Your Honor, we did ask for a 4241 examination of the defendant. As a matter of fact, I elaborated on how the defendant wandered off when I was talking to him about the issues and what to do and what not to do in the strategy of the case, and he did not have a present sense of what was going on, in my opinion, during my visits with him. But counsel for the government should have known, because in the information we got, that is in the rap sheets, it clearly showed that he had been at Patton, at the Patton Hospital for the State, on one of his convictions. And if you go to Patton, you know that that is strictly for a mental condition, not because of a physical condition. It was a Patton State Hospital. That's correct. Patton and Riverside, that's somewhere east of us. And the record showed that, not the record in the court, but the discovery that I received showed that. They knew. Is that hospital still open? It is, Your Honor, to my knowledge. It was there only two years ago. I don't know now. And also, the defendant declared that he had been taking medication for the past year. So that suggests that before, he may have been out of control and was not taking medication. So that's basically in response to the government, Your Honor. Any questions, if I may? If you could just wait one moment here. Thank you. Hang on a second, I'm sorry. Where's the passage about the doctor and so on? I was just reading it and now I've lost it again. On what page is it? On the page, Your Honor. No, in the ER, where he says, no, I don't need to see the doctor. Hi. Fifty-seven, Your Honor. Fifty-seven, okay. Yeah, I was just there. I'm now at the bottom of 56. On this question of whether he was taking his meds, the court, you've kind of given me the impression of a guy that unless you get the result you want, it's somebody else's fault, like the lawyer's fault. I told you last time, defendant, if I do something from an illness that I was in the mental hospital quite a few years back and I was prescribed medication for schizophrenia that I never take, I thought you told me that he had been taking it. In a later conversation with the court, and forgive me, I do not recall where in the transcript this is, my client did admit that he had been taking medication for the past year. And I recall that in reading. As a matter of fact, I believe it's contained in my brief, Your Honor. Well, I'm not sure I need that so much as I'm trying to figure out was the district judge abusing his discretion when he hears this in open court, and without contradiction from you, he says, you know, yeah, I was in the hospital, but I've never taken the medication. The court, are you getting it now? The defendant, no, I still won't take it now. Right now, I barely started taking it a little bit. If you want to see the physician at the jail, I've already seen the physician, so. Yeah, but he did state that he was taking medication a little bit. A little bit. While he was inside the MCC facility, and I guess he had seen a psychiatrist there, and he was prescribed medicine. The type of medicine, I do not know, Your Honor, but I know he was prescribed something. Well, page 41 of the record, on the morning of the trial, the judge, after talking about the continuance on the morning of the trial, says, I don't find that this is the product of any mental disease, schizophrenia, or anything on the part of Mr. Rodriguez until today. There's been no hint of that. So apparently the judge was reflecting on the fact that until the morning of the trial, he hadn't heard about that claim. Right? That's his finding. I recall, and again, forgive me, I don't recall when in the proceedings, I did inform the court, and it's in my brief, that I had had problems in communicating with Mr. Rodriguez. My main problem was that he would be listening to me, and then all of a sudden his questions would have to do with something else, with the weather, or with incarceration, or the food that he was being fed. And then suddenly he would come back to what we were talking originally. It's a very strange way of conversing with your attorney when you're trying to plan a trial. And I did inform the court of that, and it is in my brief, Your Honor. Well, anyway, that's what the judge said on the morning of trial. Right. Okay. All right. We'll find it. Great. Thank you, Your Honor. All right. Thank you. That is submitted.
judges: Piersol, Pregerson, Fletcher